UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___04/12/2022___

BMG MONROE I, LLC,

                              Plaintiff,

        -against-

VILLAGE OF MONROE,

                              Defendant.

No. 20 Civ. 1357 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

    Plaintiff BMG Monroe I, LLC ("BMG"), a developer of a large-scale residential cluster

subdivision named the Smith Farm Project, brings this action under 42 U.S.C. § 1983 and the Fair

Housing Act ("FHA"), 42 U.S.C. § 12101, *et seq.*, against Defendant Village of Monroe (the

"Village"). (Compl. ¶¶ 1, 4, ECF No. 1.) BMG alleges that the Village—motivated by religious

discrimination—obstructed, frustrated, and delayed the completion of the Project to exclude a

Hasidic Jewish community from seeking housing in the Village. (*Id.* ¶¶ 2, 6, 14.) Specifically,

BMG alleges that the Village (i) denied its five building permit applications for non-compliance

by intentionally misinterpreting the terms of the Smith Farm Project's conditional approval

documents; and (ii) enacted local laws targeting BMG and the Hasidic Jewish community, such as

a "no knock" solicitation law, a law restricting accessory apartments, and a law prescribing

maximum floor area ratio requirements. (*Id.* ¶¶ 7–8, 12–14.)

    Presently pending before the Court is the Village's motion to dismiss BMG's Complaint

under Federal Rule of Civil Procedure 12(b)(1) and (6). (ECF No. 29.) For the following reasons,

the Court GRANTS the Village's motion to dismiss.

## BACKGROUND

### I. Factual Background

The following facts are derived from the Complaint and the documents referenced therein and are taken as true and constructed in the light most favorable to BMG for the purposes of this motion.

BMG is a developer that owns at 78.93-acre tract of undeveloped land, with about 19.4 acres in the Village and 59.5 acres in the Town of Monroe (the "Property"). (Compl. ¶¶ 4, 17, 21.) The Property is the site of a conditionally approved residential development, which resulted from the culmination of a fourteen-year review process by Village officials. (*Id.* ¶¶ 5, 22.)

#### A.      *SEQRA Review Process and Conditional Approval of the Smith Farm Project*

In 2001, a developer (not BMG) submitted an application to the Town and Village to develop the Property for residential use: the Smith Farm Project. (*Id.* ¶ 35.) The Smith Farm Project involves 181 homes and on-site recreational amenities, including a community green, a recreation/activity center, an outdoor swimming pool, and a network of walking trails. (*Id.*, Ex. C. at 5, ECF No. 1-3.) Although only 44 out of the 181 homes would be located within the Village, the entire Smith Farm Project would connect to the Village municipal water system. (*Id.*)

The application for the Smith Farm Project triggered the New York State Environmental Quality Review Act ("SEQRA"). (*Id.* ¶ 36.) "SEQRA requires local planning boards to consider the potential environmental impact of a proposed project before granting site plan approval." *Lucas v. Plan. Bd. of Town of LaGrange*, 7 F. Supp. 2d 310, 314–15 (S.D.N.Y. 1998) (citing 6 N.Y.C.R.R. § 617.1; ECL 8–0103, subd. 7). SEQRA's statutory scheme "attempts to achieve this substantive goal by designating the public agency most significantly involved in a particular project as the 'lead' agency and by obliging that body to go through a series of procedures intended to compel consideration of the environmental consequences of any determination which finally

2

approves the project." *Id.* at 315. At a joint Town and Village Planning Board meeting on December 17, 2001, the Village Planning Board became the SEQRA Lead Agency for the project. (Compl. ¶ 36, Ex. B at 3, ECF No. 1-2.)

On June 17, 2002, the Village Planning Board issued a "positive declaration" requiring a Draft Environmental Impact Statement ("DEIS"),[1] which the developer later submitted on April 4, 2003. (*Id.* ¶ 37, Ex. B at 3). The Village deemed the DEIS complete and ready for public review on June 9, 2005. (*Id.*) After a joint public hearing held on June 29 and August 10, 2005, the Village Planning Board accepted the Final Environmental Impact Statement ("FEIS")[2] on January 23, 2006. (*Id.*)

For the Smith Farm Project, the developer proposed—and the Village agreed to allow—specific design features that did not conform to the Village's zoning code. The Village's Urban-Residential Multifamily district is a "true multi-family zoning district," permitting only specific forms of multi-family housing (stacked multi-family dwellings or row-housing) by conditional use permit. (*Id.*, Ex. C. at 8.) But "[i]nstead of designing the units in row houses or town houses, as would be required within the Village of Monroe, . . . the [developer] wished to create a more traditional layout of detached and semi-detached units and relying on specific traditional architectural designs." (*Id.* at 11). The developer "long promoted its particular project layout and

---

[1] If an application will likely have a significant adverse impact on the environment, then an "environmental assessment form" must be compiled, *see* 6 NYCRR 617.6, and a determination made as to whether the action "may include the potential for at least one significant adverse environmental impact." *Lucas*, 7 F. Supp. 2d at 315 (citing 6 NYCRR 617.7(a)). In such case, the SEQRA lead agency issues a "positive declaration" and either the agency or the applicant—at the latter's option—must prepare a DEIS. *Id.* (citing ECL 8–0109, subds. 2, 4; 6 N.Y.C.R.R. §§ 617.7).

[2] If the draft statement is accepted by the agency "as satisfactory with respect to scope, content and adequacy," it is then circulated to any other agencies having an interest in the proposal, and "interested members of the public." *Lucas*, 7 F. Supp. 2d at 315 (citing ECL 8–0109, subds. 4, 5; 6 NYCRR 617.8(b), 617.10). After allowing a period for comment, the lead agency must prepare a FEIS and circulate it in the same manner as the draft statement. *Id.* (citing ECL 8–0109, subds. 4, 5, 6; 6 NYCRR 617.10 (h)).

the integrity of its architectural and landscaping designs as the cornerstone to the project's suitability to this particular location." (*Id.*)

The SEQRA review culminated on June 19, 2006, when the Village and Town Planning Boards issued a joint Findings Statement. (*Id.* ¶ 38, Ex. C.) The Findings Statement explicitly states that the design of the proposed homes was integral to the Planning Board's approval of the project: "These Findings, and any subsequent land use approvals granted by the Village . . . rely on the incorporation of the housing styles, finishes, and the streetscape incorporated in the DEIS and attached to these Findings." (*Id.*, Ex. C at 6 n.1). Another section of the Findings Statement emphasizes the importance of the project's design to its acceptability:

> The Village and Town Planning Boards agreed that the combined layout and design of the site, as coupled with the architectural and landscaping designs presented during the SEQRA process, was consistent with clustering goals and an improvement over a standard multifamily townhouse design. The importance of that design integrity to the acceptability of the cluster cannot be over-emphasized.

(*Id.*)

The Village Planning Board also made clear that "[t]he homes and community center that will be constructed on site will follow a strict architectural code that will ensure that the constructed homes will, to the extent practicable, reflect the architectural styling of the drawings presented" to the Village by the developer during the SEQRA review. (*Id.* at 22.) Those drawings were appended to the Findings Statement and included a "Typical Rear Elevation Drawing." (*Id.* at 23.) Among "the critical architectural criteria that shall be adhered to," the Findings Statement says, "[m]ain rooflines shall be steeply sloping with 12 on 12 pitch or greater," and "[b]uilding siding shall vary among the units and consist of shingles, shiplap, stucco, stone, or brick siding materials." (*Id.*)

On August 21, 2006, the Village granted conditional preliminary approval. (*Id.* ¶ 43, Ex. E, ECF No. 1-5.) In this conditional preliminary approval, the Village again emphasized the importance of the specific proposed layout and architectural designs to the project's acceptability:

> The Planning Board's rationale for clustering the row house site plan is based on the incorporation of the housing designs, finishes and streetscape proposed by the applicant and incorporated in the SEQR Findings. The cluster approvals and all other subsequent land use approvals granted by the Village or Town Planning Board for this project, rely on and therefore are conditioned on the incorporation of the housing styles, finishes, and the streetscape incorporated in the DEIS and attached to the SEQR Findings.

(*Id.*, Ex. E at 7.) Sometime between 2006 and 2015, BMG took control over the developer's application, and sought and obtained several extensions of the preliminary approvals as it went about satisfying the conditions of preliminary approval. (*Id.* ¶ 44.)

On August 10, 2015, the Village completed an updated environmental review and, together with the Town, issued an Amended Findings Statement. (*Id.* ¶ 48, Ex. G, ECF No. 1-7.) The Amended Findings Statement clarified and modified certain mitigation measures, but otherwise left "[t]he original SEQRA Findings Statement . . . in full force and effect." (*Id.*, Ex. G at 11). That same day, the Village and Town granted conditional final approval (the "Final Approval"). (*Id.* ¶ 51, Ex. B.)

Like the Findings Statement and conditional preliminary approval, the Final Approval states that the specific layout and architectural designs submitted during the environmental review were critical to the project's approval. It includes several general conditions of approval, including "[f]ull compliance with all SEQR Findings." (*Id.*, Ex. B at 10.) It also includes various specific findings and mitigations measures, including:

> The Village and Town Planning Boards agree that cluster authorization is suited to the project site, coupled with the specific layout set forth in the plans that accompanied the filed DEIS and consistent with the architectural and landscaping designs incorporated during the SEQRA process. Said architectural designs are

referenced in Section 5.9 of the SEQRA Findings, [and are incorporated into the plans and as specific conditions to this land use approval as sheet A-1].

(*Id.*)

There are also "Specific Visual Impact Findings and Mitigation Measures." (*Id.* at 16–18.) Like the Findings Statement, this section reiterates that "[t]he homes . . . that will be constructed on site will follow a strict architectural code that will ensure that the constructed homes will, to the extent practicable, reflect the architectural styling of the drawings presented" by the original developer to the board, including the "Typical Rear Elevation Drawing." (*Id.* at 17.) This section also enumerates the same "critical architectural criteria that shall be adhered to in order to achieve the desired visual effect," including that "[m]ain rooflines shall be steeply sloping with 12 on 12 pitch or greater" and "[b]uilding siding shall vary among the units and consist of shingles, shiplap, stucco, stone, or brick siding materials." (*Id.*)

Pursuant to the Final Approval, BMG sought and obtained approvals from the Village Building Inspector to begin work on required project improvements and off-site improvements in the Village. (*Id.* ¶ 53.)

B.      *United Monroe and its discriminatory animus against the Hasidic Jewish community*

In 2013, some residents of Monroe (presumably from both the Town and Village) created a citizens' opposition group called United Monroe. (*Id.* ¶ 58.) According to BMG, the purpose of United Monroe was to "prevent the Hasidic Jewish community from purchasing housing in or moving to the Town and Village and preventing the development of housing that would accommodate the needs of the Hasidic Jewish community." (*Id.*) BMG claims that United Monroe has "vexatiously opposed" the Smith Farm Project after learning that Mr. Ziggy Brach, a developer who United Monroe believed to be from Kiryas Joel (an adjacent municipality inhabited

6

predominantly by the Orthodox Jewish community) had an interest in the project because it would make housing available to the Hasidic Jewish community. (*Id.* ¶¶ 59, 61.)

United Monroe's chairperson, Emily Convers, who was also an alternate member of the Village Planning Board, repeatedly criticized the Village Planning Board for approving the Smith Farm Project by claiming that "Monroe citizens do not want more density." (*Id.* ¶ 60.) She attacked the Smith Farm Project because "it would make available high density housing in the Town and the Village that could be purchased or occupied by the Hasidic Jewish community." (*Id.* ¶ 63.) BMG claims that the comments from United Monroe's leaders and supporters reveal anti-Hasidic animus because the proposed housing in the Smith Farm Project "could be purchased by Orthodox Jewish families in need of housing in the region." (*Id.* ¶¶ 64–70.)

BMG claims that after some of United Monroe's supporters were elected to the Town Board and unsuccessfully attempted to obstruct the Smith Farm Project, the Village "picked up the mantle and began to obstruct and delay the project any other new residential development at every turn." (*Id.* ¶ 106.)

C.    *The Village Moratorium and 2017 Code Amendments*

In June 2016, the Village adopted a moratorium on certain permits, certificates, and approvals for new residential developments. (*Id.* ¶ 107, Ex. O, ECF No. 1-15.) The moratorium explicitly exempted "previously approved . . . subdivisions" like BMG's. (*Id.*, Ex. O at 2.)

In June 2017, the Village amended provisions of its Code. (*Id.* ¶ 110.) Among these amendments is an update to its "Accessory Apartment" law, (*id.* ¶ 112), which permits occupants of single-family homes to add accessory structures "in order to provide the opportunity and encouragement for the development of small, rental housing units." (*Id.*, Ex. Q at 1, § 200-61, ECF No. 1-17.)

D.    *The Building Permit Applications and Subsequent Proceedings*

In a letter dated October 19, 2017, to the Town Supervisor, Town Board, and Town Planning Board, the Village's Mayor asked Town officials to stop issuing permits for structures located inside the Town that exceeded the approvals out of concern for its ability to supply water to the entire project site. (*Id.*, Ex. U, ECF No. 1-21.) The Village's Mayor explained that "the SEQR findings were predicated on the size of the units as reflected in the final resolution of approval. The Village cannot supply water for units in the Town where permits are issued willy nilly for homes beyond the approved size limitations." (*Id.*)

Between October 2017 and May 2018, BMG submitted, and the Village Building Inspector[3] denied, several discrete applications for construction relating to five different lots in the Village. Specifically, on October 31, 2017, BMG submitted building permit applications related to the construction on Lots 1, 2, and 3. (*Id.* ¶ 128; Dorfman Decl., Ex. 1, ECF No. 30-1.[4]) On November 3, 2017, the Village Building Department returned both applications as incomplete for failing to include, *inter alia*, the section/block/lot numbers and a sewer permit. (Dorfman Decl., Ex. 1.) On December 22, 2017, BMG submitted revised applications for Lots 1, 2, and 3, which the Building Inspector denied four days later. (*Id.*, Ex. 2, ECF No. 30-2.)

On January 31, 2018, BMG submitted building permit applications related to the construction on Lots 45 and 46. (*Id.*, Ex. 3, ECF No. 30-3.) The Building Inspector later denied

---

[3] The Village Code provides the Building Inspector with discretion to determine whether to issue a building permit: "No building permit or certificate of occupancy shall be issued by the Building Inspector, except where all the provisions of this chapter, as approved by the Planning Board, have been complied with." (Dorfman Decl., Ex. 4 at § 175-24, ECF No. 30-4.) The Village Code also vests the Building Inspector with the "enforcement" authority to make this determination, *i.e.*, whether "all the provisions of this chapter, as approved by the Planning Board, have been complied with." (*Id.*)

[4] "It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)." *Missere v. Gross*, 826 F. Supp. 2d 542, 553 (S.D.N.Y. 2011) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998)).

these applications on February 5, 2018, for failure to comply with the SEQRA Findings, including the rear elevation, roof pitch, and siding requirements. (*Id.*)

On March 29, 2018, BMG appealed the February 5 denial of the applications relating to Lots 45 and 46 to the Village Zoning Board of Appeals ("ZBA").[5] (Compl. ¶ 135.) On April 26, 2018, BMG submitted five revised applications, one for each of Lots 1, 2, 3, 45, and 46. (*Id.* ¶ 140; Dorfman Decl., Ex. 5, ECF No. 30-5.) On May 7, 2018, the Building Inspector denied all of the revised applications. (Compl. ¶ 142; Dorfman Decl., Ex. 5.)

Ten days later, BMG amended its appeal to the ZBA to include the May 7, 2018 denials relating to Lots 45 and 46. (Compl. ¶ 144, Exs. X and AA, ECF Nos. 1-24 & 1-27; Dorfman Decl., Ex. 8, ECF No. 30-8.) In its appeal to the ZBA, BMG sought to overturn the May 7, 2018 denials, but did not request the ZBA to grant a variance from the conditions of the Planning Board's approval. (Compl. ¶ 144, Ex. AA; Dorfman Decl., Ex. 8 at 1.)

On November 13, 2018, after holding a hearing, the ZBA voted to uphold the Building Inspector's determination. (Compl. ¶ 150; Dorfman, Decl., Ex. 9, ECF No. 30-9.) Because under Village Law, the ZBA had to approve a written decision by December 10, 2018, which was one day before the ZBA's next meeting, it asked BMG if it would consent to a one-day extension (to December 11, 2018) to approve the written decision. (Dorfman Decl., Ex. 9 at 6–7.) BMG agreed. (*Id*. at 7.) At the December 11 meeting, the ZBA voted to adopt the written decision upholding the Building Inspector's determination relating to Lots 45 and 46. (Compl. ¶ 155, Ex. AA.)

Between December 2018 and November 2019, BMG submitted building permit applications for twenty-nine homes within the Village, including for Lots 45 and 46 (the subject

---

[5] The Village Code vests the ZBA with the power, "upon an appeal from a decision or determination of the administrative official charged with the enforcement of this chapter, to grant area variances." (Dorfman, Decl., Ex. 7 at § 200-75(C)(1)(a), ECF No. 30-7.)

of the ZBA appeal). (Dorfman Decl., Ex. 10, ECF No. 30-10.) The Building Inspector approved all of them, including those for Lots 45 and 46. (*Id.*)

E.     The "No Knock Solicitation" and Proposed "Floor Area Ratio" Laws

In October 2017, the Village adopted Local Law No. 7 of 2017, amending the Village Code's provisions relating to "Peddling and Soliciting." (Compl., Ex. FF at 2, ECF No. 1-34.) The stated purpose of the law "is to protect the well-being, tranquility, personal safety, and privacy of the Village residents, which includes protecting residents from unwanted, harassing, and disruptive intrusions and solicitations upon residential property, and to protect residents from fraudulent, misleading, or otherwise unfair consumer sales practices, deceptive door-to-door solicitations, and criminal activity." (*Id.*) BMG claims that the purpose of this "No Knock" solicitation law is to make housing unavailable to the Hasidic Jewish community. (*Id.* ¶ 186.) Specifically, BMG claims that Village officials complained that Hasidic Jewish real estate brokers or investors were inquiring whether any Village residents would be willing to sell their homes, reason for which the solicitation law prohibits solicitation for home sales in the Village by real estate brokers or investors who have not registered with and obtained permission from the Village. (*Id.* ¶¶ 183–84.)

In October 2018, the Village proposed the adoption of a local law establishing a maximum gross residential floor area ratio ("FAR") for dwellings in certain districts. (*Id.* ¶ 174, Ex. DD, ECF No. 1-32.) By letter dated October 15, BMG objected to the proposed FAR law, claiming it would adversely affect the Smith Farm Project. (*Id.* ¶ 180. Ex. EE, ECF No. 1-33.) At a meeting the next day, the Village Board specifically addressed BMG's letter. (Dorfman Decl., Ex. 13 at 2, ECF No. 30-12.) The Village clarified that it never intended the law to "apply . . . to [previously approved] subdivisions and site plans," like the Smith Farm Project. (*Id.*) The Village later revised the proposed law to explicitly incorporate that exemption. (*Id.*, Ex. 14 at § 200-24.1(A)(2)(a), ECF No. 30-14.)

F.     *BMG's Article 78 proceedings challenging the ZBA's decision*

On November 29, 2018, BMG commenced an Article 78 proceeding in state court to challenge the ZBA's decision: *BMG Monroe I, LLC v. Vill. of Monroe ZBA et al*, index No. 70181/2018 (Sup. Ct. Westchester Cnty). (*Id.*, Ex. 11 ¶ 5, ECF No. 30-11.) As in the instant suit, BMG claimed the Building Inspector and ZBA were motivated by animus against the Hasidic Jewish community. (*Id.*)

On October 9, 2019, the state court denied BMG's Article 78 suit and upheld the ZBA decision. (*Id.*, Ex. 12, ECF No. 30-12.) The state court found BMG failed "to demonstrate that the actions of the ZBA in affirming d the determination of the Building Examiner to deny the subject building permits was illegal, arbitrary or capricious, or an abuse of discretion." (*Id.* at 5.) The state court ruled that "the ZBA's determination . . . was rational and supported by the record . . . [and was not] illegal or an abuse of discretion." (*Id.*) The state court also rejected BMG's request for mandamus relief to compel the Building Inspector to issue the building permits, ruling the decision to issue building permits "necessarily involved the exercise of discretion. (*Id.* at 5–6.)

## II.  Procedural Background

On February 17, 2020, BMG filed the instant lawsuit against the Village. (Compl., ECF No. 1.) On May 15, 2020, the Village sought leave to file a motion to dismiss, which the Court subsequently granted and issued a briefing schedule. (ECF Nos. 12 & 14.) After a series of extensions, the parties filed their respective briefing on the instant motion in March 2021: the Village its notice of motion (ECF No. 29), memorandum in support ("Motion," ECF No. 31), declaration with accompanying exhibits (Dorfman Decl., ECF No. 30), and reply ("Reply," ECF No. 28); and BMG its response in opposition ("Response in Opposition," ECF No. 27-6) and a declaration with accompanying exhibits (Rosborough Decl., ECF No. 27).

**LEGAL STANDARD**

### I.  Federal Rule of Civil Procedure 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already*, LLC, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation omitted). The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists. *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009).

When, as here, the case is at the pleading stage, in deciding a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Id.* at 143. But "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Buday v. N.Y. Yankees P'ship*, 486 F. App'x 894, 895 (2d Cir. 2012) (summary order) (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)).

### II.  Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Freidus v. Barclays Bank PLC,* 734 F.3d 132, 137 (2d Cir. 2013). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do"; rather, the complaint's "[f]actual

allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. In applying these principles, the Court may consider facts alleged in the complaint and documents attached to it or incorporated by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks and citation omitted).

## DISCUSSION

BMG asserts a total of four claims against the Village: two claims under 42 U.S.C. § 1983 (for alleged violations of the Due Process Clause and Equal Protection Clause), and two claims under the FHA (for allegedly making housing unavailable for a Hasidic Jewish community and retaliation). (Compl. at 46–51.) BMG bases its four claims on several alleged adverse actions by the Village, including the denial of five building permit applications, the "No Knock" solicitation law, the "Accessory Apartment" law, and the FAR law. (*Id.* ¶¶ 7–8, 12–14.)

The Village seeks to dismiss BMG's claims for lack of subject matter jurisdiction based on ripeness and mootness, and for failure to state a claim. (Mot. at 18–32.) Accordingly, the Court must first address the Village's challenge to subject matter jurisdiction and will only analyze its remaining arguments if the Court has subject matter jurisdiction over this case. *See Brokamp v. James,* --- F. Supp. 3d ---, No. 21-CV-389, 2021 WL 5444277, at *2 (N.D.N.Y. Nov. 22, 2021) ("Subject matter jurisdiction is a threshold issue and, thus, when a party moves to dismiss under both Rules 12(b)(1) and 12(b)(6), the motion court must address the 12(b)(1) motion first." (citations omitted)).

## I.    Standing

Before addressing the Village's arguments, the Court first *sua sponte* addresses BMG's standing to bring this case on behalf of a third party. *See In re Clinton Nurseries, Inc.*, 998 F.3d 56, 63 (2d Cir. 2021) ("Because constitutional standing implicates the subject matter jurisdiction of the Court, [courts] may raise the issue [*sua sponte*].")

A review of the Complaint reveals that the main premise behind BMG's asserted causes of action is that the Village's adverse actions against BMG were motivated by a discriminatory animus against "the Hasidic Jewish community." (*See, e.g.*, Compl. ¶ 2 ("The Village . . . , like other municipalities in Orange County, is engaged in a long-standing campaign to exclude or substantially limit the Hasidic Jewish community from seeking housing in the Village, in violation of the [FHA]."); *id.* ¶ 6 ("[T]he Village has done nothing but obstruct, frustrate, and delay the completion of the Project on constantly changing, superficial grounds, all design to promote Village's long-standing scheme to keep out the Hasidic Jewish community, at all costs."). In view of the above, however, the Complaint is unclear whether BMG, a developer and limited liability corporation organized and existing under the laws of New York, is asserting its claims on behalf of a third party: a member of the Hasidic Jewish community.

Generally, a plaintiff may not rest his claims to vindicate the constitutional or statutory rights of third parties. *See Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 80, (1978); *Singleton v. Wulff*, 428 U.S. 106, 113–14 (1976); *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 643–44 (2d Cir. 1988).

As the United States Supreme Court has explained:

> Federal courts must hesitate before resolving a controversy, even one within their constitutional powers to resolve, on the basis of the rights of third persons not parties to the litigation. The reasons are two. First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not. . . . Second, third parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them.

*Singleton*, 428 U.S. at 113–14 (internal citations omitted); *accord Duke Power Co.*, 438 U.S. at 80.

Based on these considerations, the Supreme Court has "narrowly limited the circumstances in which one party will be given standing to assert the legal rights of another." *Duke Power Co.*, 438 U.S. at 80. A plaintiff may assert a claim on behalf of third parties only where (1) the third parties have suffered an "injury in fact," (2) the plaintiff has a "close relation" to the third parties such that the plaintiff will effectively represent the third parties' interests, and (3) the third parties are hindered in their ability to protect their own interests. *See Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *Joseph H. Munson Co.*, 467 U.S. at 956; *Singleton*, 428 U.S. at 114–15; *Kane*, 843 F.2d at 643–44.

Here, to the extent that BMG asserts claims seeking to assert the rights of "the Hasidic Jewish community," BMG lacks standing to bring such claims because nowhere in its Complaint does it include allegations satisfying the three requirements outlined above. To begin, even when construing the Complaint in the light most favorable to it, BMG fails to sufficiently identify any members of "the Hasidic Jewish community" whom it seeks to assert their rights. Consequently, BMG fails to allege in its Complaint which third parties from the Hasidic Jewish community suffered an injury in fact, if any.

Even had it done so, BMG still fails to allege what is its "close relation" to those third parties such that BMG will effectively represent their interests. "A close relation supporting third-party standing exists when 'the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.'" *Fenstermaker v. Obama*, 354 F. App'x 452, 455 (2d Cir. 2009) (quoting *Singleton v. Wulff*, 428 U.S. 106, 115 (1976)); *see also Eisenstadt v. Baird*, 405 U.S. 438, 445 (1972) ("[T]he relationship

between Baird and those whose rights he seeks to assert is not simply that between a distributor and potential distributees, but that between an advocate of the rights of persons to obtain contraceptives and those desirous of doing so.").

Here, nowhere in its Complaint does BMG allege, for example, that (1) it is developing the Smith Farm Project only for Hasidic Jewish communities; (2) the homes within the Smith Farm Project are specifically advertised for Hasidic Jewish communities; or (3) people who have purchased homes to be developed within the Smith Farm Project are members of the Hasidic Jewish community. Additionally, to the extent that BMG is alleging that members of the Hasidic Jewish community could *potentially* purchase homes within the Smith Farm Project, such allegation would still be insufficient because parties may not premise third-party standing "on relationships with hypothetical future clients." *Fenstermaker*, 354 F. App'x at 455 (citing *Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004) ("The attorneys before us do not have a 'close relationship' with their alleged 'clients'; indeed, they have no relationship at all.").

And finally, nowhere does BMG allege in its Complaint that these third parties from the Hasidic Jewish community whom it seeks to assert their rights are "hindered in their ability to protect their own interests." Accordingly, BMG may not assert its claims in an attempt to vindicate the constitutional or statutory rights of any third party.

However, as noted above, BMG bases its claims here, in part, on laws that the Village enacted which allegedly caused injuries in fact to unspecified members of the Hasidic Jewish community. The first of these laws is the Village's "No Knock" solicitation law, which BMG alleges prevents Hasidic Jewish real estate brokers or investors to inquire whether any Village residents would be willing to sell their homes. (Compl. ¶ 184.) Yet, nowhere does the Complaint allege any facts indicating that such law caused BMG an injury in fact. At best, the Complaint

alleges that real estate brokers and investors who are members of the Hasidic Jewish community are those who are injured by the "No Knock" solicitation law, but not BMG. Therefore, as BMG fails to allege that such law caused it an injury in fact, and also fails to satisfy the elements required to assert claims on behalf of third parties, then BMG cannot rest its claims on the "No Knock" solicitation law for lack of standing.

The second of these laws is the Village's "Accessory Apartment" law, which restricts the ability of property owners to add accessory apartments to their residences to serve "the special housing needs of single persons and couples." (*Id.* ¶ 112.) BMG alleges that this law limits the size of an accessory apartment to no more than 1,000 square feet, which "unlawfully excludes families, and especially Hasidic Jewish families, on its face" because larger families are prevalent in the Hasidic Jewish community. (*Id.*) However, as the Village correctly points out, by its terms, this law applies *only* to occupants of *existing homes*, and not to developers of contemplated homes such as BMG. (*Id.*, Ex. Q at 1, § 200-61.) In other words, as the "Accessory Apartment" law does not apply to it, then BMG has not suffered any injury in fact and therefore lacks standing to assert its claims based on that law. Moreover, even assuming that BMG sufficiently alleges that the "Accessory Apartment" law caused an injury in fact to members of the Hasidic Jewish community, BMG would still not be able to rest its claims on such law for failure to satisfy the elements required to assert claims on behalf of third parties.

And the last of these laws is the Village's FAR law, which establishes a maximum gross residential floor area ratio for dwellings in certain districts. (*Id.* ¶ 174, Ex. DD.) However, after BMG objected to the proposed FAR law, claiming it would adversely affect the Smith Farm Project, (*Id.* ¶ 180, Ex. EE), the Village clarified that the "law does not apply . . . to [previously approved] subdivisions and site plans," like the Smith Farm Project. (Dorfman Decl., Ex. 13 at 2.)

Indeed, the Village later revised the proposed law to explicitly incorporate the exemption. (*Id.*, Ex. 14 at § 200-24.1(A)(2)(a).) Hence, as the FAR law does not apply to it, then BMG has not suffered any injury in fact and therefore lacks standing to assert its claims based on that law. Moreover, even assuming that BMG sufficiently alleges that the FAR law caused an injury in fact to members of the Hasidic Jewish community, BMG would still not be able to rest its claims on such law for failure to satisfy the elements required to assert claims on behalf of third parties.[6]

In sum, BMG cannot rest its claims on the laws that the Village enacted because BMG fails either to sufficiently plead that these laws caused it an injury in fact, or to satisfy the elements required to assert claims on behalf of third parties whom the laws may have caused an injury of fact. With that in mind, the Court now addresses the Village's ripeness arguments.

## II.    Ripeness

The Village contends that BMG's claims under § 1983 and the FHA are unripe for this Court to have subject matter jurisdiction over them. (Mot. at 18–20.) The Village argues that since these claims are premised on the denial of BMG's building permit applications, such denials must constitute "final decisions" for them to inflict an actual and concrete injury so that BMG's claims are ripe. (*Id.*) But the Village contends that as BMG neither appealed its denied applications for Lots 1, 2, and 3, nor did it seek a variance for those relating to Lots 45 and 46 that it did appeal, then none of its claims are ripe because none of these denials constitute final decisions by the Village. (*Id.*) After due consideration, the Court agrees.

---

[6] At the time the parties briefed the instant motion, the FAR law had not yet been adopted by the Village. (*See* ECF No. 37.) However, in a letter dated July 15, 2021, BMG represented to the Court that the Village had adopted the same or a virtually identical FAR law on May 24, 2021. (*Id.*) Yet, the fact that the Village has now adopted the FAR law does not disturb the Court's conclusion that BMG lacks standing to rest its claims on such law.

"To be justiciable, a cause of action must be ripe—it must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993)). "A claim is not ripe if it depends upon 'contingent future events that may or may not occur as anticipated, or indeed, may not occur at all.'" *Id.* (quoting *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 580–81 (1985)); *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) ("The ripeness requirement prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur, depending on the final administrative resolution.").

Claims involving a land use decision will be unripe "until the government charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019). That is because "[a] final decision is 'a definitive position on the issue that inflicts an actual, concrete injury.'" *R-Goshen LLC v. Vill. of Goshen*, 289 F. Supp. 2d 441, 448 (S.D.N.Y. 2003), *aff'd* 115 F. App'x 465 (2d Cir. 2004) (quoting *Williamson*, 473 U.S at 193). "The ripeness requirement of *Williamson*, although announced in a takings context, has been extended to equal protection and due process claims asserted in the context of land use challenges." *Dougherty*, 282 F.3d at 88 (collecting cases). "[C]ourts in this circuit have also extended it to FHA claims." *Safe Harbor Retreat, LLC v. Town of E. Hampton, N.Y.*, No. CV 14-2017 LDW GRB, 2015 WL 918771, at *5 (E.D.N.Y. Mar. 2, 2015), *aff'd*, 629 F. App'x 63 (2d Cir. 2015).

"A final decision exists when a development plan has been submitted, considered and rejected by the governmental entity with the power to implement zoning regulations." *S & R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 461 (S.D.N.Y. 2008). Even if a plan has been submitted and rejected, a claim is not ripe until the "property owner submit[s] at least one meaningful application for a variance." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005). Four considerations undergird the requirement that plaintiffs seek a variance before requesting relief from a federal court: (1) the need to develop a full record; (2) "only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a particular parcel;" (3) "a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes," thereby enforcing "the longstanding principle that disputes should be decided on non-constitutional grounds wherever possible;" and (4) "[r]equiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution." *Id.* (citations omitted).

Here, the Village is correct that the Complaint and the documents referenced therein themselves indicate that BMG never appealed the Building Inspector's denials relating to Lots 1, 2, and 3 to the ZBA. Thus, any claim resting on such denials is not ripe. Furthermore, while BMG did request the ZBA to overturn the Building Inspector's denials relating to Lots 45 and 46, BMG did not request a variance from the ZBA for the Planning Board's approval conditions. (Dorfman Decl., Ex. 8 at 1.) Indeed, BMG had the right to request a variance from the ZBA under the Village Code. (Dorfman Decl., Ex. 7 at § 200-75(C)(1)(a). Thus, since BMG never exercised that right, the ZBA's decision upholding the Building Inspector's denials did not affect BMG's ability to seek a variance. *See Thomas v. Town of Mamakating, New York*, No. 18 CV 4295 (VB), 2019 WL

20

1017318, at *4 (S.D.N.Y. Mar. 4, 2019), ("Plaintiff does not allege she either sought or was denied a variance. The ZBA's affirmation of [the building inspector]'s decision did not affect plaintiff's ability to seek a variance."), *aff'd*, 792 F. App'x 24 (2d Cir. 2019) ("Because [plaintiff] can still seek a use variance from the zoning board and has not done so, [the court] cannot evaluate how the Town's zoning rules will ultimately be applied to [plaintiff]'s property."). As such, BMG's claims, which can rest only on these denials as alleged in the Complaint, are unripe.

But BMG argues that its claims are ripe because any attempt to pursue a final decision, such as requesting a variance from the ZBA, would be futile. (Resp. in Opp'n at 24.) BMG avers that "the Village has made clear that any further . . . applications to conform the approvals to conform the approvals explicitly to the proper interpretation of the design requirements will be denied, [hence,] any further applications for a variance would be futile." (*Id.*) But the Court disagrees.

Courts recognize one exception permitting federal court review of a non-final decision—"if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." *Murphy*, 402 F.3d at 349. This occurs when "a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." *Id.* Courts have interpreted this futility exception narrowly. *Missere v. Gross*, 826 F. Supp. 2d 542, 555 (S.D.N.Y. 2011). "Although the precise contours of the futility exception are not well-defined, courts in the Second Circuit have recognized that mere allegations of open hostility are not sufficient to invoke the futility exception." *Norwood v. Salvatore*, No. 12-cv-1025, 2015 WL 631960, at *5 (N.D.N.Y. Feb. 13, 2015) (internal citations and quotations omitted); *Osborne v. Fernandez*, No. 06-cv-4127, 2009 WL 884697, at *6 (S.D.N.Y. Mar. 31, 2009), *aff'd*, 414 F. App'x 350 (2d Cir. 2011)

(rejecting futility argument based on allegations that "defendant decisionmakers were hostile to plaintiffs' proposed development or act[ed] in bad faith").

Here, however, nowhere in its Complaint does BMG allege "that the [Building Inspector or ZBA] lack[] discretion to grant the relief it seeks, nor has it alleged that [they] . . . have made clear that applications for relief will be denied." *Lost Trail LLC v. Town of Weston*, 289 F. App'x 443, 445 (2d Cir. 2008) (summary order). In fact, even when drawing all inferences in favor of BMG, the only allegation in the Complaint discussing futility is the one in which BMG alleges that after the *Town* (not the Village) denied "its exemption/variance application," it "had no choice but to commence an action" against the *Town* (not the Village) "to vindicate the violation of its constitutional rights and seek appropriate relief." (Compl. ¶ 104.) As a result, "[a]bsent such allegations, the noted disagreement [between BMG and the Village] is not enough, by itself, to demonstrate futility." *Id.* Thus, the Court concludes that BMG's claims are unripe—and therefore, the Court dismisses them without prejudice.[7]

---

[7] Because the Court concludes that BMG's claims are unripe, it does not reach the Village's mootness argument. Specifically, the Village argues that, to the extent BMG's claims rest on the denials of the building permit applications relating to Lots 45 and 46, its claims are moot because the Building Inspector later granted BMG's renewed building permit applications for those same lots—rendering any potential claim resting on these denials moot. (*See* Dorfman Decl., Ex. 10.)

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the Village's motion to dismiss (ECF No. 29) and DISMISSES BMG's Complaint without prejudice for lack of subject matter jurisdiction. The Clerk of the Court is directed to terminate the motion at ECF No. 29 and this action.

Dated:  April 12, 2022
       White Plains, NY

SO ORDERED:

NELSON S. ROMÁN
United States District Judge